```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 18-CR-115
 4              Plaintiff,            .
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   DOMENIC LAURENCE MICHELI,        .  May 2, 2018
                                      .
 7              Defendant.            .
     - - - - - - - - - - - - - - - -

 8

 9                  TRANSCRIPT OF DETENTION HEARING
                 BEFORE THE HONORABLE G. MICHAEL HARVEY
10                  UNITED STATES MAGISTRATE JUDGE

11

     APPEARANCES:
12
     For the Government:        MAIA MILLER, AUSA
13                             United States Attorney's Office
                               555 Fourth Street Northwest
14                             Washington, D.C. 20530
                               202-252-6737
15
     For the Defendant:        TONY MILES, AFPD
16                             Federal Public Defender's Office
                               625 Indiana Avenue Northwest
17                             Suite 550
                               Washington, D.C. 20004
18                             202-208-7500

19

20

21   Transcribing Court Reporter:  SARA A. WICK, RPR, CRR
                                    U.S. Courthouse, Room 4704-B
22                                  333 Constitution Avenue Northwest
                                    Washington, D.C. 20001
23                                  202-354-3284

24

     Proceedings recorded by audio recording.
25   Transcript produced by audio transcription.
```

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  This is criminal case year

 3      2008-115, United States versus Domenic Micheli.  This is a

 4      detention hearing.

 5          Will the parties, please, introduce themselves to the

 6      Court, beginning with the government.

 7              MS. MILLER:  Good afternoon, your Honor.  Maia Miller

 8      for the United States.

 9              THE COURT:  Good afternoon.

10              MR. MILES:  Good afternoon, your Honor.  Tony Miles

11      for Mr. Micheli.

12              THE COURT:  So a few things.  I signed another order

13      this morning based on input from Dr. Grant, and the competency

14      hearing that I ordered yesterday has been changed.  The date for

15      it has been changed to May 7th.  She will have that report

16      available for the Court and the parties on May the 8th.  So

17      there is a new order that I signed that reflects that.

18          I also received a filing from you, Mr. Miles, and I haven't

19      received anything from the government.  Is that correct,

20      Ms. Miller?

21              MS. MILLER:  Yes, your Honor.  I apologize.  I

22      actually attempted to send an e-mail to your Honor's law clerk,

23      Mr. Bacchus, and it bounced back twice.  For what it's worth,

24      the case law which Mr. Miles cites is the exact same case law

25      that was attached to the e-mail that I sent to your Honor's law
```

1    clerk.

2              THE COURT:  And did you reach the same conclusion as

3    Mr. Miles?

4              MS. MILLER:  Yes, with one exception, which is --

5              THE COURT:  I will hear first from the government, and

6    then I will hear from you, Mr. Miles.  I read your piece,

7    though, and I read the cases.

8              MR. MILES:  Thank you.

9              MS. MILLER:  And the only thing that the government

10   would add to the support that Mr. Miles cites is there's one

11   case out of the Western District of Oklahoma which reaches the

12   opposite conclusion than Magistrate Judge Robinson did in the

13   Crawford case from 1990.  I have a copy of the case, if you

14   would like to see it.  It's from 2008.  In that case -- I think

15   the defendant's name is Mosey.  It takes the position that the

16   magistrate judge should make a determination on competency

17   first, because if, in fact, a defendant is found to be not

18   competent, then the defendant can't meaningfully participate in

19   presenting a defense or making any challenges to the

20   government's request with respect to detention or preliminary

21   hearings.  But in all fairness, it is out of the Western

22   District of Oklahoma; whereas, the other two cases which

23   Mr. Miles cites are out of D.C.

24             THE COURT:  Okay.  So what's the government proposing?

25   What are you saying I should do here today?  Are you saying I

1    should do what that western case does, Western District of --

2    what did you say?  Ohio?

3        MS. MILLER:  Oklahoma, Mosey.  It's more recent than

4    Judge Robinson's case.

5        The government asks that the defendant be detained as a

6    serious risk of flight.  And so the government is prepared to go

7    forward with a detention hearing now, and certainly, as

8    indicated in the cases that Mr. Miles has cited and which the

9    government also knows, there is support for the position that

10   that's not an unreasonable position to take.

11       However, if the defendant is being detained for other

12   reasons, for example the determination of whether or not he's

13   competent, then the government believes he should be detained to

14   pursue that evaluation.  I think that --

15       THE COURT:  Do you know that you've got to make a

16   showing that the defendant, you know, would not show up for

17   outpatient competency evaluation?  You don't think the

18   government has to make some showing at this point if you're

19   going to rely on his need for a competency evaluation?

20       MS. MILLER:  Yes, the government does take that

21   position and agrees with your Honor.

22       THE COURT:  I'm sorry.  I don't know what position.

23   That you have to make a showing, or you don't have to make any

24   showing at all?

25       MS. MILLER:  We would have to make a showing.

1          THE COURT:  Okay.

2          MS. MILLER:  But separate and apart from that, we are

3     asking that he be detained as a serious risk of flight, and that

4     is our primary argument on detention, is that the defendant

5     poses a serious risk of flight and he should be held because of

6     that.

7        Separate and apart from that, we have concerns related to

8     competency, and so that's why we asked, and we think we -- our

9     request is reasonable that he be evaluated by Dr. Grant.

10          THE COURT:  Okay.  Mr. Miles -- in any event, you're

11     ready to go forward with the detention hearing today?

12          MS. MILLER:  Yes, your Honor.

13          THE COURT:  Okay.  Mr. Miles?

14          MR. MILES:  We would also agree we should go forward

15     with the detention hearing today, and if the Court agrees, I can

16     argue why I believe my client should be released.

17          THE COURT:  We are going to start first with

18     Ms. Miller on that.

19          MR. MILES:  Okay.  Fair enough.

20          THE COURT:  But my view of it -- and I haven't had a

21     great deal of time to think about it.  I've reviewed the cases

22     that were a part of Mr. Miles's filing.  I or my clerks have

23     found a smattering of other cases.  And they go both ways on

24     this issue as to whether or not -- the issue being whether or

25     not the Court should move forward -- if there's a question of

competency, move forward to a detention hearing, what comes first.

So I'm prepared to move forward today, because at the very least I don't believe I have a reasonable basis to determine that the defendant is incompetent yet.  I may, after I review Dr. Grant's report, but I haven't made that decision yet.  So I think the assumption is that he's competent until there's been at least that finding by the Court otherwise, which is important.  If I hold to that in future cases, the government needs to be prepared with this new system that might take five days or six days to get the evaluation.

So for that reason, I assume that Mr. Thomas is competent until I at least have a reasonable basis to believe otherwise. I believe I've got a basis to get a competency evaluation done, and that's scheduled for May 8th.

So with that out of the way, I'm ready to conduct the detention hearing.  Ms. Miller?

MS. MILLER:  Thank you, your Honor.  Your Honor, the government -- and I would refer to the copy of the *Gerstein*, which was the sworn statement presented to the Court in -- or the C-10 judge over the weekend.  If your Honor needs another copy of it --

THE COURT:  Sure.  That would be great.  I do have it here, yes.

MS. MILLER:  So we would incorporate that as a part of

1    my argument on -- that the defendant poses a serious risk of

2    flight.

3         As I mentioned yesterday, I would like to draw the Court's

4    attention to a number of statements that the defendant made to

5    the Secret Service officers when they arrested him on Friday

6    outside of the White House property.  The first is that the

7    defendant stated he had been spending time in several states,

8    that the defendant last came from California, which is

9    consistent with Secret Service confirming that the defendant's

10   car is registered in California and the license plate on the car

11   was a California license plate.  However, the government knows

12   that the defendant's driver's license is a Tennessee driver's

13   license and includes a Nashville address.

14        The defendant also stated to the Secret Service officers

15   that he had recently visited a number of states, many of which

16   were out west, also that he had visited Boston, which is,

17   obviously, out east, that the defendant was unwilling to on the

18   scene provide numbers or addresses for family members, and the

19   Secret Service officers indicated that it appeared that the

20   defendant had been living out of his car, based on the quantity

21   and the type of personal property that was found in the

22   defendant's car.

23        I would also note that the Pretrial Services report

24   indicates that they recommend that the defendant be held without

25   bond and that, according to the Pretrial Services report, the

1    defendant has indicated that he does not have a fixed address.

2         In addition, I note that the defendant's conduct of

3    ignoring what the police officers on the scene asked him to do,

4    mainly to leave the property of the White House grounds,

5    supports our request that he poses a serious risk of flight.  He

6    has no known contacts to D.C., no family members in D.C., no one

7    here that would support a connection to D.C. at all.  So we

8    believe he poses a risk of flight, serious risk of flight.

9         THE COURT:  Okay.  Has this case been assigned to a

10   district court judge?

11        MS. MILLER:  Yes, your Honor.  It's before Judge

12   Friedman.  Yesterday, we had set a status hearing for, I think,

13   May 18th.

14        THE COURT:  You were before Judge Friedman in this

15   case?

16        MS. MILLER:  No.  Your Honor set a status hearing for

17   Judge Friedman.

18        THE COURT:  Oh, I did.  That's right.  Thank you.

19        MS. MILLER:  In addition to the facts that I just

20   recited to your Honor as support for our position on serious

21   risk of flight, I would also note that the defendant's

22   statements, which also form the basis of our position that we

23   think a mental observation or a mental health screening -- a

24   competency screening is appropriate, also from the government's

25   perspective supports our request that he poses a serious risk of

1   flight.  And by that, I mean the defendant told the Secret

2   Service on the scene that he, quote, was the president and that

3   he wasn't going anywhere, did they not tell you that I was

4   coming, that he had come to the White House to lead the nation.

5        And at a later point in time with this interaction with the

6   Secret Service, the defendant indicated that the government had

7   put needles in his car to scare him, and furthermore, the

8   defendant admitted to being depressed and to seeking mental

9   health treatment at a facility in Nashville.

10        THE COURT:  Do you know of any like cases where

11   someone has been charged with this charge, a misdemeanor, and

12   been held for risk of flight, Ms. Miller?

13        MS. MILLER:  Yes, your Honor.  And forgive me that I

14   don't remember the defendant's name, but I think last week or

15   within the last two days before Magistrate Judge Robinson the

16   exact scenario occurred.  And I think they are now -- they're in

17   a situation where there's a contested competency hearing, or

18   maybe there's been conclusion of the competency hearing.  But

19   there, the defendant was held as a serious risk of flight and

20   also --

21        THE COURT:  Do you have the name of that defendant?

22        MS. MILLER:  I don't.  I know my colleague, AUSA

23   Kenerson, is handling it, and it was before Magistrate Judge

24   Robinson last week or the week before.

25        THE COURT:  Okay.

1          MS. MILLER:  And I think something was appealed to

2     Judge Sullivan.  Judge Sullivan had to sit in as chief judge for

3     Chief Judge Howell.  So Judge Sullivan was ultimately the one

4     who decided that he should be detained.

5          THE COURT:  Not Judge Robinson?

6          MS. MILLER:  Judge Robinson did.  It was appealed.

7          THE COURT:  I didn't know who --

8          MS. MILLER:  Judge Sullivan, that's correct.

9          THE COURT:  Okay.

10          MR. MILES:  Your Honor, I want to begin with that

11     case.  I'm somewhat familiar, because --

12          THE COURT:  Do you know the name of the defendant?

13          MR. MILES:  Jabr, J-a-b-r, I believe, is how you spell

14     the last name.  The attorney from our office handling that case

15     spoke with me about that.  We talked about it.  And I understand

16     that that person was held by Magistrate Judge Robinson.  Then

17     they had to appeal it.  The case was assigned to Judge Friedman.

18     He was not available.  It would normally then go to the chief

19     judge.  I understand she was not available.  So the next person

20     in line was Judge Sullivan, who is the motions judge.  I'm not

21     sure if the government suggested that Judge Sullivan affirmed

22     what Judge Robinson did, but that's not true.  Judge Sullivan

23     released that defendant.

24          And your Honor may have seen me consult with Ms. Petras a

25     moment ago.  She informed me that they're having a detention

hearing right now.  I believe she -- her understanding is that he's -- Ms. Jabr, I'm sorry, that Ms. Jabr is being released or she's already released, but I think Judge Friedman is affirming that is what I'm understanding, yes.

THE COURT:  How do you spell her last name?

MR. MILES:  I believe it's J, J-a-b-r.  What I do know, from talking to my colleague, is that Judge Sullivan released her, and the last I heard is that she was released and found that it was inappropriate to have -- and was very adamant that she had to be released from the cell block, you know.  I think there was an issue about her going back to the jail and being released from the jail.  He wanted her released from the cell block.  So that's how that --

THE COURT:  Same charge?

MR. MILES:  Same charge.

THE COURT:  Same sort of facts, the White House?

MR. MILES:  I would suggest their facts are more benign, but similar.

THE COURT:  That's it?

MR. MILES:  That should be enough really.  Isn't that enough?

Your Honor, it's our position that the continued detention of my client is unlawful.  I want to underscore two critical facts.  He is charged with a misdemeanor, number 1, and number 2, he's presumed innocent.

1        THE COURT:  Let's just deal with number 1.  You can

2   hold someone under an (f) hold, even if it's a misdemeanor.  Are

3   you disputing that?

4        MR. MILES:  I'm not, but there has to be dangerousness

5   or flight risk.

6        THE COURT:  Flight risk -- actually, I don't know if

7   you can hold someone -- there are certain charges, I think, that

8   you can hold someone if it's -- other than for risk of flight.

9   But I don't think that there's any limitation.  If someone is a

10  risk of flight, they can be held on a misdemeanor.

11       MR. MILES:  It's true.  That's possible.

12       THE COURT:  You started with saying it's unlawful.

13       MR. MILES:  I do think -- not for that reason alone.

14  I think, under all the facts, that my client's detention is

15  unlawful.  I think the fact that this is a misdemeanor is a

16  critical fact in that analysis.

17       THE COURT:  How is it critical to analysis of flight?

18       MR. MILES:  Because one important factor about flight

19  is how much time the defendant is facing.

20       THE COURT:  Okay.

21       MR. MILES:  And here, no more than one year.  As far

22  as I can tell with respect to the guidelines, the lowest

23  possible range available is zero to six months.

24       And as the Court is well aware, the Bail Reform Act favors

25  release over detention, especially when we are dealing with

1    people who are presumed innocent, have not been convicted of a

2    crime.

3        As the Court heard yesterday, it is our position that his

4    detention beginning from Saturday was unlawful.  He should have

5    been released on that very first day.  The Bail Reform Act is

6    very careful about limiting when a person may be detained after

7    their first appearance before a judicial officer and examples of

8    when you can detain, you know.  The types of things you need to

9    detain a person at that stage is for certain crimes of violence,

10   not all but certain crimes of violence, certain controlled

11   substance offenses, where the maximum sentence is life in prison

12   or death.  I can go on.  One of which, of course, is serious

13   risk of flight.  That is one of them.  I emphasize, one.  It's

14   not -- the statute says if the Court finds that the case

15   involves -- not that the government simply comes in and claims

16   there is a serious risk of flight and we can come back later and

17   try to figure out whether they're right.  The Court has to

18   determine does this really involve not just a risk of flight but

19   a serious risk of flight.

20        THE COURT:  Preponderance of the evidence; right?

21        MR. MILES:  Yes.

22        THE COURT:  Okay.

23        MR. MILES:  I would submit, your Honor, that what the

24   government has shown Saturday, yesterday, today does not come

25   close to being a serious risk of flight.

1    I recall, when I've researched this issue in the past -- I

2    didn't get to look at that issue before this hearing.  But the

3    cases make clear that when you hold somebody based on flight

4    alone, it should be done very infrequently.  And the examples I

5    recall seeing in those kinds of cases is when somebody has

6    failed to appear in court before, especially if they failed to

7    appear on numerous occasions, when you're dealing with issues

8    where somebody was found with passports, you know, in different

9    people's names.

10    I recall a case where the government had information that

11    the -- I don't recall if they heard the phone calls or saw some

12    e-mails, but they had information that the defendant, before the

13    case was charged, made statements such as, Well, if I get caught

14    or I get arrested, I'm going to flee the country.

15    There are situations where there's some indication, based

16    on the way money is moving, lots of money moving in different

17    bank accounts, maybe ties with people overseas.

18    It's that type of conduct that can support detention based

19    on flight, not simply because somebody may be homeless, somebody

20    may have been roaming around the country, somebody may or may

21    not -- of course, we're not acknowledging what he did or didn't

22    do with respect to the White House, but according to the

23    government, goes up to the White House grounds, claims to be the

24    president, and for a moment says I won't leave and then quickly

25    consents to a search of his vehicle.  These are not sufficient

bases to show or indicate that he is a serious risk of flight.

They are relying on things that are an improper basis for holding somebody, such as homelessness.  It doesn't appear that they're saying -- I'm not sure what the government's position is with regard to the competency issue or mental illness, but that's not -- or perceived mental illness.  That's not a basis either.  Jail is not a homeless shelter.  It's not a mental health treatment facility.  When we're dealing in the pretrial context, in this case when we are dealing with a misdemeanor, it's only for those who are a serious flight risk.

More specific issues with my client, because I talked about what it's not for, when you look at my client, he's never failed to appear in court before.  He has no prior convictions.  There's no indication that he's ever failed to comply with court conditions, probation, or pretrial release.  There's no evidence that he wants to flee and avoid prosecution.  There's no evidence of any strange activity in his bank accounts, any overseas contacts, any false passports.  There's just none of that in this case, your Honor, and there's absolutely no basis to hold my client pending trial.

Now, as far as what we propose, my client's mother is here --

THE COURT:  Is she here?  I was going to ask you.  Thank you, ma'am, for coming.

MR. MILES:  From Rochester, New York.  So an

appreciation for how far she came.

I will say, though, your Honor, that my client is a grown man, prefers not to reside with his mother.  He would rather be released in the community.  He does have some money still, he indicated yesterday, with which he can get a motel initially, perhaps an apartment afterwards, if need be a homeless shelter.  Those are not the ideal conditions.  Those are not what I would prefer, what he would prefer, but our --

THE COURT:  That's better, in his mind, than New York?

MR. MILES:  Yes.

THE COURT:  Okay.

MR. MILES:  There are other family members I spoke with.  At some point there may be a possibility of modifying and living with other persons, but they're just -- that's not an option now or even this week.  So for today, we are asking that he be released, be ordered to report to Pretrial Services, certainly in person --

THE COURT:  Where is he going to go?

MR. MILES:  As I indicated, like he's been living on his own in different places for the last several months, he knows how to get a motel, stay there initially, try to find an apartment.  There are homeless shelters.  We've discussed all these options and possibilities.

As I indicated, I wish I can present the Court with a better plan, but I cannot.  Our view is lawfully the Court --

1   because that plan is not as good, the option is not to

2   incarcerate him.  There is a plan.  We think it's sufficient

3   enough to deal with the issues of flight.  And we ask --

4            THE COURT:  The plan is release?

5            MR. MILES:  Yes.  One fact that would make this a lot

6   easier for him, and I spoke with the government yesterday, is

7   that I understand the government has his wallet, money, debit

8   cards, possibly credit cards.  He would need those back in order

9   to live day to day.  So we ask the Court to release him on the

10   conditions I suggested.

11            THE COURT:  Is he going to -- I didn't hear any

12   conditions, Mr. Miles.

13            MR. MILES:  Report to Pretrial in person once a week.

14            THE COURT:  Okay.

15            MR. MILES:  And that could change if his residence is

16   more stable.  Because he doesn't have a residence yet, I think

17   he should report in person and, you know, personal recognizance.

18   It's a misdemeanor offense.  He has no prior conviction.  I

19   think the Court's obligation is to impose the least restrictive

20   condition.  I don't think there should be any other conditions.

21            THE COURT:  Are you suggesting that he be ordered to

22   stay within the D.C. area?

23            MR. MILES:  I do, yes.  That's a good condition.  I

24   overlooked that one.  I think he should at this stage.

25            THE COURT:  But stay away from the White House?

1          MR. MILES:  There is no opposition to that condition.

2     Thank you, your Honor.

3          THE COURT:  Okay.  Ms. Miller, anything further?  Is

4     there someone here from Pretrial?  Oh, sorry.  I didn't see you

5     there.  Let me hear from Pretrial first.

6          MR. SIDBURY:  Yes, your Honor.

7          THE COURT:  So I see the recommendation, which is that

8     he not be released, if I'm reading this correctly.

9          MR. SIDBURY:  That's correct, your Honor.

10          THE COURT:  He's here on a misdemeanor.  What's the

11     basis for your recommendation that he should not be released but

12     held pending trial in this misdemeanor case?

13          MR. SIDBURY:  The reason was because he did not have

14     a -- he didn't have any links to the Washington metropolitan

15     area.  I spoke to his mother, and she agreed he could live

16     there, but there was an issue that he did not want to live

17     there.  So that was more so; the stability of him reporting back

18     to court was the issue.  And we knew that if he was held without

19     bond he would report back to court.

20          THE COURT:  Well, that's true.  Okay.  Anything else?

21          MR. SIDBURY:  Your Honor, we did speak to the Western

22     District of New York, if you were to order the defendant to

23     report -- to live with his mother.  They would do courtesy

24     supervision in that jurisdiction.

25          THE COURT:  Okay.  Ms. Miller?

1          MS. MILLER:  Your Honor, the government maintains our

2     request.  We believe that the defendant does pose a serious risk

3     of flight.  All of the things that Mr. Miles raised doesn't

4     undermine the government's position, from my perspective.  He

5     doesn't have any connections to the D.C. area.  He doesn't have

6     a residence.

7          THE COURT:  Hundreds of millions of people in this

8     country have no connection to the D.C. area.  Am I going to lock

9     them up if you charge them with a misdemeanor?

10          MS. MILLER:  Well, no, your Honor, but in this

11     particular case, when the defendant is given an option of

12     staying with his mother, of which Pretrial then follows up with

13     to say that out of a courtesy the Western District of New York

14     would provide supervision while the defendant was on pretrial

15     release and the defendant says he doesn't want that, from the

16     government's perspective, that's significant.

17        We believe that he's a serious risk of flight.

18          THE COURT:  Okay.  Mr. Miles, tell me a little bit

19     more about the situation with his mother.  Why should I not

20     order him to live with her?  Would that be just not feasible?  I

21     know that it's not the preference, but she's here.  Is she not

22     prepared to take on that obligation?

23          MR. MILES:  She is prepared to take on that

24     obligation, your Honor.

25          THE COURT:  It's your client who doesn't want it?

1          MR. MILES:  My client does not want to live with her.

2     I don't really want to get into any further details.

3          THE COURT:  Now is the time to get into the details.

4     Perhaps she should come forward.  If I release him into her

5     custody, I want to know that she's prepared to do that, thinks

6     she can manage it, and thinks that he will comply.

7          MR. MILES:  The Court can inquire, but our position is

8     that's not what he wants.  And under the circumstances -- I

9     think the Court's obligation is to ensure that he's released

10    unless he's a serious flight risk and, if he's released, that it

11    be under the least restrictive conditions.  The Court really

12    needs to make sure he's not a danger -- that's why we have the

13    White House restriction -- and not a flight risk.  I'm proposing

14    he stay closer to the D.C. area, which is certainly preferable

15    in some regards than being up in Upstate New York.

16        I just -- I see some benefit to him being with his mother.

17    I acknowledge that.  But I think that that's not what he wants.

18    He's an adult.  I think that what we proposed is sufficient

19    enough to assure his appearance in court.

20         THE COURT:  If I order that he live with his mother,

21    is he going to comply with that order?

22         MR. MILES:  I'm sure he will comply with any order of

23    the Court, your Honor.

24         THE COURT:  Okay.  I would like to hear from his

25    mother.  Ma'am, can you come forward, please?  Just come to the

1    microphone.  If you could just state your name for the record.

2         MS. MICHELI:  Mary Micheli.

3         THE COURT:  Thank you so much for coming here today.

4    I really appreciate it.  One possibility that I have available

5    to me is that I could release your son into your custody.  He's

6    your son; correct?

7         MS. MICHELI:  That's correct.

8         THE COURT:  You will have certain obligations if I

9    were to do that.  Essentially, you've got to make sure that he

10   complies with the orders of this Court.  The most important one

11   is -- well, A, that he doesn't commit another crime and, B, that

12   he comes back to court.  You may need to assist him in making

13   sure that happens.  There's going to be various court dates in

14   this case, and he's got to show up.  And if he doesn't show up,

15   then a warrant will be issued for his arrest.  He will be

16   arrested.  And that is itself another criminal violation which

17   he could be charged with.

18        That's why it's really important that if I give him into

19   your custody and if I do make the decision to do that, you will

20   have to swear that you will do your level best to make sure he

21   complies with the conditions that I set for him.

22        So A, I want to make sure that you are ready, willing, and

23   able to do that.

24        MS. MICHELI:  Yes.  I do have an apartment.  He's

25   going to have to sleep on the couch.  I mean, it's not ideal

1   circumstances.  But I would also like him to start getting some

2   kind of treatment, and I don't know if he's going to agree to

3   that.

4           THE COURT:  Okay.  All right.

5           MS. MICHELI:  Or at least be evaluated for treatment.

6           THE COURT:  Well, we're going to have a competency

7   evaluation.  It's a little different.  It's not all that he may

8   need.  I don't know what his situation is, and you don't have to

9   put that on the record.  I know enough to make the decision I've

10  got to make today.

11      So I don't know what more could be done if he was released,

12  if Pretrial here or up in New York can provide mental health

13  evaluation.  Is that something that could be done, Mr. Sidbury?

14          MR. SIDBURY:  Your Honor, at this time we did not

15  speak to them about any kind of mental health evaluation.

16          THE COURT:  You can do that here; right?  Just in a

17  regular case, that's something you could offer here in a

18  different case; right?  So it's possible that the Western

19  District of New York will be able to do that, or what district

20  is it?  Is it Rochester?

21          MS. MICHELI:  Rochester.

22          MR. SIDBURY:  Yes, your Honor.  And yes to both

23  questions, your Honor.

24          THE COURT:  So it's possible they could do that as

25  well?

1          MR. SIDBURY:  That is correct.  And if you would like

2     me to go find out, I can, but we did not ask that.

3          THE COURT:  Okay.  Mr. Miles, you had something you

4     wanted to add?

5          MR. MILES:  Your Honor, this option, as I say, is an

6     option that I can see where it has its benefits, but

7     regrettably, my client informed me, because of how serious he'll

8     take the Court's order, that he would prefer to be detained than

9     live with his mother.  I hope the Court can appreciate in that

10    preference that he's not asking, Oh, let me go live with my

11    mother, and then he gets out and he's going to flee.  He's

12    saying, I want to abide by the Court's order; if that's the

13    Court's order, I would rather be detained.  It's a testament to

14    the fact that he's going to take the Court's order seriously.

15        Again, I reiterate our request that he be released under

16    the plan that we suggest.

17         THE COURT:  All right.  Thank you, ma'am.  Thank you

18    for your assistance.

19        So we are going to pass this case.  I'm going to have to

20    think about this, and I know we have other cases to do.  I also

21    want to see what's going on in the Jabr case.  Okay.  So we will

22    pass this case.  Thank you.

23        Mr. Sidbury, did I answer your question?  I would like you

24    to check if New York can do mental health evaluation treatment.

25         MR. SIDBURY:  I will, your Honor.

1        (Recess taken.)

2            THE COURTROOM DEPUTY:  Recalling criminal case year

3    2018-115, United States versus Domenic Micheli.  This is a

4    detention hearing.

5            THE COURT:  Okay.  Anything further the parties want

6    to add?  Government?

7            MS. MILLER:  Your Honor, the government maintains its

8    position, which is we believe that the defendant poses a serious

9    risk of flight, and he should be detained pretrial.

10       I'm curious, though, if your Honor had -- if your Honor is

11   contemplating releasing the defendant to the third-party custody

12   of his mother, the government would ask that your Honor inquire

13   of either the defendant or his mother that there wouldn't be an

14   increased risk of any danger or violence to the community, the

15   defendant, or the mother.

16       In support of this request, I just note that it is unusual

17   that a defendant, when posed with the option of being released

18   to the custody of a third party versus being detained, the

19   defendant chooses detention.  So on behalf of the government, I

20   think it's prudent to make such an inquiry if, in fact, your

21   Honor does decide to release the defendant to his mother's

22   third-party custody.

23           THE COURT:  Okay.  Mr. Miles?

24           MR. MILES:  Well, I will begin by saying that that's,

25   unfortunately, not his -- he would prefer to be incarcerated

1   than be released to his mother.  So we hope that's not an

2   option.  But if it is, I have no reason to have any concerns

3   regarding dangerousness.  I would not want the Court to make any

4   inquiries of my client, because he's my client.  If the Court

5   wants to inquire of the mother, I have no problem with that.

6        THE COURT:  Mr. Sidbury, what did you learn?  Did you

7   learn anything about New York?  Can they do mental health

8   counseling?

9        MR. SIDBURY:  Your Honor, New York can do mental

10  health counseling.

11       THE COURT:  Okay.  Here's my other question.  What

12  about this as an option, Mr. Sidbury:  What about a halfway

13  house right here in D.C.?

14       MR. SIDBURY:  Your Honor, that was discussed, and the

15  defendant would be eligible to be placed in a halfway house.

16       THE COURT:  Sure.  I thought so.

17     So I am going to deny the government's motion that he be

18  held pending trial in this case.  The defendant has no prior

19  record, no failures to appear that I'm aware of in the Pretrial

20  Services report.  He faces but a misdemeanor here and, under the

21  guidelines, zero to six months if he were to be convicted.  So

22  there's not any incentive for him to do -- other than come here

23  and deal with this charge.

24     That said, he has no fixed address, appears to be living

25  out of his car, traveled from somewhere, perhaps across country

to get here, and he's got no contacts in the D.C. area.  There
was some suggestion of a mental health concern, but I will just
say that, you know, there's been no finding that he's
incompetent and that, for the period of these hearings, he has
acted appropriately in court, answered all my questions -- when
was that?  Yesterday?  Yesterday, and he remembers.  And
Mr. Miles tells me that he is actively engaged in the defense of
his case.  So whatever mental health issue there is remains to
be seen.

But I am concerned enough about the government's showing
that I think we have to put him on restriction to make sure
that -- at least in the near term, I will allow him an
opportunity to demonstrate to the Court that he will be in
compliance, and it may be that after some period of time he can
have even fewer restrictions.

There are very few options available to the Court.  I am
frustrated at what this case nearly is, you know, allegations
that someone who may well be homeless and has mental health
issues needs to be locked up.  I just don't think that that's
right, and the parties need to work hard in the future in like
cases to avoid placing the Court in that sort of a situation,
where that is their only choice.

I think there are other choices, and that is -- one is his
mother, but I am concerned about what may happen if I were to
place the defendant in his mother's third-party responsibility,

make her third-party custodian of him.  I don't know everything
that is going on, but I've heard enough to be concerned that
that would not be a good option here.  I agree with government
counsel that it is rare that someone would choose to go to jail
rather than choose to go to their home or a home that is
available to them and live with their mother.  So I'm not going
to press that issue.

I think the better option is that he stay here, which seems
to be the government's concern, that he might flee.  So fine, we
will keep him here.  I'm going to put him into a halfway house.
I'm going to also order that he stay away, and there's a map
that Judge Sullivan used in that Jabr case.

And I will note that I've read through that docket, and he
was released, and in that case the government's position was
that that individual should be released.  So I'm not quite
certain what the difference is here.  I see a very similar case
on the facts as that case, and the government has a different
position here.

But in any event, he ultimately was released.  It even
appears that Judge Robinson was trying to release him but
thought it best to first do that competency evaluation.  I'm
taking them in somewhat different order here based on the ruling
I made earlier.  I have yet to find a reasonable basis to
believe that there is a competency issue.  We will find that out
next week.

1          So it did appear that Judge Robinson thought that at some

2     point he should be released.  Certainly, that was Judge

3     Sullivan's view.  Him.  I mean her.  Ms. Jabr in that other case

4     is what I'm referring to.  So for that reason as well, because I

5     think this case is very similar to that one, I think there

6     should be a like result.

7          In that case, however, there did appear to be a parent who

8     showed up.  And I credit Ms. Micheli for doing the same thing

9     here, but we've got other issues that appear to be happening

10    here that are not happening in the Jabr case.  Judge Sullivan

11    released Ms. Jabr to the third-party custody of her father.  But

12    it appears that individual is also here in D.C., because he

13    ordered her to stay in a hotel here in D.C.  I don't know quite

14    what that -- but she appears to also be here.

15         So it may be in the coming days that the defendant can

16    figure out a better situation than a halfway house.  But between

17    now and whenever you decide to file such a motion, if ever,

18    Mr. Miles, to seek a further review of the defendant's

19    conditions of his release, I'm going to order that he be placed

20    in a halfway house, that he stay away from the White House

21    complex, stay away from the map that's -- and I've got a copy of

22    that map here.  Stay within Washington, D.C., and that he report

23    to Pretrial Services in person tomorrow and that he also be

24    evaluated for purposes of mental health treatment and that he

25    cooperate with that evaluation and whatever treatment is

1    recommended.

2         He has another court date before Judge Friedman.  So the

3    release order should reflect as well he's to be back in court --

4    did I tell you the date?  May 18th; is that correct?  May 18th

5    at 11:30 before Judge Friedman.

6         And he also has a come-up for purposes of Dr. Grant's

7    evaluation.  So I think we should also set a further date before

8    this court so I can deal with any competency issues that may

9    need to be addressed following Dr. Grant's report.  Not a

10   come-up.  He will have to make himself available on, I think,

11   May the 8th.

12            MS. MILLER:  I had in my notes May 7th before

13   Dr. Grant.

14            THE COURT:  I think that changed.

15            THE COURTROOM DEPUTY:  (Inaudible).

16            THE COURT:  All right.  So those are two dates as well

17   that we've got to get on there.

18       Yes, Mr. Miles?

19            MR. MILES:  In my experience, when someone is released

20   to a halfway house, they do not go immediately.  It may take a

21   few weeks.  So I think if that's the case, then we probably do

22   need a come-up for May 7th.  And if that's the case, if he fails

23   to report tomorrow, it's because he --

24            THE COURT:  I will hear from Mr. Sidbury on that.  My

25   understanding is there are beds available, that there's not a

1    wait.

2              MR. SIDBURY:  Your Honor, I did not speak to anyone in

3    the actual halfway house unit.  However, I can call my office to

4    find out.

5              THE COURT:  Okay.  Let's find that out, then, so

6    there's no confusion and that the defendant knows what to do.

7         So I also have, Mr. Sidbury, this map, which is the White

8    House grounds.  I will pass it down to the government to make

9    sure that that's what they want.  Oh, you have it?  Perfect.

10             MS. MILLER:  I have one.  So if it's --

11             THE COURT:  Can I see that one?

12             MS. MILLER:  I only have one copy, though.

13             THE COURT:  Oh, I see.  There's also stay away from

14   the Capitol.  In the other case, there must be some issue with

15   the Capitol in that case.

16             MR. SIDBURY:  I was told by a supervisor that when

17   they checked on Friday it was two weeks, a two-week wait.

18             THE COURT:  See, I thought that there were beds that

19   are available for this purpose, I heard, when the head of

20   Pretrial presented to all of the judges.  She said there were 10

21   beds.  So are all 10 beds filled up with other pretrial

22   releasees?

23             MR. SIDBURY:  Your Honor, I would have to -- again, I

24   don't know who I could call at this point.

25             THE COURT:  I'm just confused.  Maybe that is -- maybe

1    that's the answer, that there's already 10 pretrial releasees in

2    this courthouse who have taken up that bed space.

3        So who did you talk to?

4            MR. SIDBURY:  I talked to my supervisor.  If you would

5    like for me to call someone -- I haven't spoken to anyone from

6    the halfway house unit, but I can call them, if you would like.

7            THE COURT:  Yeah, let's do that.  I need to know

8    what's going on.

9            MR. SIDBURY:  If you can pass --

10           THE COURT:  I will.  I've got a warrant to do.

11       (Recess taken.)

12           THE COURTROOM DEPUTY:  We are back on the record.

13           THE COURT:  Yes, Mr. Sidbury.  What can you tell me?

14           MR. SIDBURY:  I spoke with someone at the halfway

15   house unit, and they indicated the wait would still be anywhere

16   from seven days to 14 days.

17       In reference to how a defendant will be placed, you will

18   have to contact DOC, but based off of the latest information, we

19   had three people placed yesterday.  Initially, they were placed

20   in the halfway house on April the 17th, April the 18th, and

21   April the 21st, and they were just placed in the halfway house

22   yesterday.

23           THE COURT:  So it's about two weeks.

24           MR. SIDBURY:  That's correct, your Honor.

25           THE COURT:  Okay.  I will take this up off-line.  I'm

1    still confused as to what it means when there are supposedly 10

2    beds available but it takes two weeks to get one of them.

3    Perhaps they're all full.  I still don't know.  But I will take

4    that up off-line.

5         So it's going to take about two weeks, Mr. Miles.  So I

6    think you're right.  We need to do a come-up, and it will be a

7    come-up for the evaluation and the hearing on the evaluation.

8    The evaluation will be on May 7th.  The hearing will be before

9    me on May 8th at 1:45.

10        Yes?

11            MS. MILLER:  Your Honor, when you have the hearing on

12   the day after the evaluation, will we have the benefit of the

13   report from Dr. Grant?

14            THE COURT:  She will get it by noon.

15            MS. MILLER:  Okay.

16            THE COURT:  And then I guess we may need one as well

17   for the hearing before Judge Friedman.  Hopefully, by then, the

18   defendant will be placed, but we should probably go ahead and

19   make sure.  Hopefully, he will be in the halfway house by that

20   time.

21        Okay.  Halfway house.  Stay away from the White House

22   complex, which is the map that will be attached to the order,

23   the release order, and that's the area bounded by I Street

24   Northwest, Ninth Street Northwest, Constitution Avenue

25   Northwest, and 18th Street Northwest.  I'm handing down the map.

1    Essentially, you have to stay away from the White House, sir.

2        Do you understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Okay.  You are to report whenever you are

5    released -- it's not going to be tomorrow.  So he needs to

6    report to Pretrial within 24 hours of his release from jail.

7        And then how often thereafter is he to report, Mr. Sidbury?

8    Once a week?

9            MR. SIDBURY:  Yes, your Honor.

10           THE COURT:  Once a week in person.

11       Again, sir, if you comply with all of these conditions,

12   over some period of time, you can ask Mr. Miles or maybe you can

13   come up with a better plan for how you're going to live here in

14   D.C.  It sounds like you've got some money.  You might find a

15   hotel or some long-term residence that makes sense for you and

16   that's better than the halfway house.  I or Judge Friedman will

17   certainly entertain any motion for further amendment to the

18   conditions of your release, but for now, those are the

19   conditions I'm going to place you on.

20       Anything further from the government in terms of

21   conditions?

22           MS. MILLER:  No, your Honor.

23           THE COURT:  Okay.  Mr. Miles, is that all feasible?

24           MR. MILES:  (Inaudible).  Thank you.

25           THE COURT:  We have an order Mr. Sidbury is going to

1    bring to you in a moment, and you need to sign it.

2         MR. MILES:  (Inaudible) yesterday's order -- I know

3    the Court said the Court entered one today, which I didn't see,

4    but I noticed the motion yesterday actually said the motion was

5    by defense counsel.

6         THE COURT:  For?

7         MR. MILES:  The screen.

8         THE COURT:  Okay.  Well --

9         MR. MILES:  I don't know if that was corrected in

10   today's?

11        THE COURT:  Unfortunately, I'm not certain if it was,

12   but the record will reflect -- that certainly was an error.

13   It's not your motion.

14        MR. MILES:  Right.

15        THE COURT:  It was the government's motion.  All

16   right.  We will -- okay.

17        MR. MILES:  Thank you.

18        THE COURT:  Okay.  I'm making one correction.  The

19   hearing on the 8th is at 1:45, courtroom 6.

20      Okay, sir.  You can stand.  The clerk is going to swear you

21   in in a moment that you are going to comply with these

22   conditions.  Did you already do that?

23        THE COURTROOM DEPUTY:  No, not yet.

24        THE COURT:  Oh, all right.  I'm also adding the

25   condition that you be -- you receive a mental health evaluation

1    and treatment.  Okay?  So I expect you to cooperate with that as

2    well.

3         Do you understand?

4              THE DEFENDANT:  Yes.

5              THE COURT:  In fact, I expect you to cooperate with

6    and comply with all these conditions of your release.  If you

7    fail to do so, understand that your release conditions can be

8    reversed, and you could be incarcerated.

9         Do you understand that?

10             THE DEFENDANT:  Yes.

11             THE COURT:  If you fail to show up to any of the court

12   proceedings in this case, the first one being on the 8th, a

13   warrant will be issued for your arrest.

14        Do you understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  That your failure to appear may itself

17   result in further criminal charges brought against you.

18        Do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Most importantly, when you are on release,

21   you cannot commit another crime, including returning to the

22   White House.  That would not only be its own separate crime, but

23   be a violation of this Court's order and provide a basis to hold

24   you in contempt.

25        Do you understand that as well?

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  All right, then.  Go ahead and swear him

 3    in.

 4              THE COURTROOM DEPUTY:  Raise your right hand, sir.  Do

 5    you solemnly swear to follow the conditions of your release as

 6    set forth by this Court, so help you God?

 7              THE DEFENDANT:  Yes.

 8              THE COURTROOM DEPUTY:  Thank you.

 9              THE COURT:  All right.  I will see the parties back

10    here on May 8th at 1:45.  The parties are excused.

11         (Proceedings adjourned.)

12

13    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

14

15              CERTIFICATE OF TRANSCRIBING COURT REPORTER

16

17         I, Sara A. Wick, certify that the foregoing is a true

18    and correct transcript, to the best of my ability, from the

19    audio-recorded proceedings in this matter and that said

20    transcript has been compared with the audio recording.

21

22    /s/ Sara A. Wick                    June 11, 2018

23    SIGNATURE OF COURT REPORTER         DATE

24

25
```